# United States Court of Appeals
## For the First Circuit

No. 08-1167

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL PELLETIER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

Stephen D. Riden, with whom Michael J. Tuteur, Erica Templeton Spencer, Nathalie E. Cohen, Michael Thompson and Foley & Lardner LLP were on brief, for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom Paula D. Silsby, United States Attorney, was on brief, for appellee.

December 1, 2011

**HOWARD**, **Circuit Judge**. After a six-day jury trial in July 2007, Michael Pelletier was convicted of various counts related to his role in the importation, possession and distribution of marijuana.[1] He was sentenced to life imprisonment. On appeal, he asserts that the district court erred when it admitted certain testimony, improperly instructed the jury, and denied his motion for acquittal based on insufficiency of the evidence. We affirm.

## I. Background

We recite the relevant factual background in the light most favorable to the verdict. United States v. Gonzalez-Ramirez, 561 F.3d 22, 24 (1st Cir.), cert. denied, 130 S. Ct. 524 (2009). The scheme at the heart of Pelletier's convictions was relatively simple. A confederate of Pelletier's either swam or was driven across the St. John River into Canada from a point near Madawaska, Maine.[2] After meeting with Canadian marijuana suppliers, Pelletier's associate swam back across the river, most often carrying the contraband in two, thirty-pound, watertight duffel bags, although occasionally ferrying larger amounts. The purchase price of the marijuana was approximately $1,000 per pound.

---

[1]Pelletier was convicted of conspiracies to import and distribute marijuana, money laundering and Social Security fraud. He was one of six people indicted on the distribution count. In addition to Pelletier, who was tried individually, two of the six, Raymond Fogg and Anthony Caparotta, were convicted in a joint trial. The others pled guilty.

[2]Pelletier himself was confined to a wheelchair due to a childhood accident.

Pelletier, or those working under him, later sold the marijuana for $2,200 - $2,800 per pound.

## II. Evidentiary issues

This appeal primarily invokes challenges to the testimony of Pelletier's former girlfriend and that of Adam Hafford, who was one of Pelletier's "swimmers."[3] Pelletier attacks this testimony in two slices. The first cantle concerns evidence of Pelletier's criminal history. The second, directed only at Hafford's testimony, implicates the hearsay exception for statements against interest set forth in Federal Rule of Evidence 804(b)(3).

### A. Pelletier's prior crimes

On the eve of trial, Pelletier filed a motion in limine to exclude, inter alia, evidence of his prior drug convictions.[4] During a chambers conference prior to the first trial day, defense counsel agreed that Pelletier would not object to testimony that he had been in prison, but counsel expressed his objection to testimony about the reason for Pelletier's incarceration, viz., drug trafficking convictions. The trial judge expressed his view that he "[didn't] think that gets in." The prosecutor responded that he "didn't anticipate eliciting from any of the witnesses the reason why Mr. Pelletier was in prison." At the same time, however, the prosecutor cited various authorities for the

---

[3]Hafford testified pursuant to a plea and cooperation agreement.

[4]According to the government, Pelletier had four felony drug convictions in Maine state court in 1994 and 2001.

-3-

proposition that prior drug trafficking involvement can be admitted to prove a defendant's knowledge or intent.

During the first day of trial, Pelletier's former girlfriend, Kendra Cyr, testified that Pelletier had told her in January 2001 that he was going to jail "for something he had done previously." Pursuant to the parties' agreement, the trial court instructed the jury that the fact of incarceration was offered for context only, and was neither indicative of Pelletier's character nor probative as to the pending charges. Things did not go as smoothly when the subject of Pelletier's prior incarceration was next broached.

Hafford testified on the third day of trial. He testified that he met Pelletier "in Windham . . . sometime between 2000 and 2004." When asked why the two were "at Windham," Hafford replied, "Um, he was there for drug charges, and I was there for -" at which point defense counsel cut off the testimony with an objection to the admission of Pelletier's criminal history.[5] The prosecutor immediately stated that he "didn't claim it." At sidebar, he added that the testimony was elicited unintentionally, as the result of "an inartfully-phrased question," and that he had no objection to the jury being instructed to ignore the testimony. Defense counsel did not immediately agree, noting that "the cat's out of the bag."

---

[5]The record reflects that in 2001 Hafford and Pelletier were in a state correctional facility in Windham, Maine, and that Pelletier was released before Hafford.

-4-

After excusing the jury, the court stated, "I guess my thought, as I began to hear the questions this morning, was that I was inclined to admit the evidence of the prior convictions anyway." The court's reasoning was based on defense counsel's cross-examination of an earlier witness, Jeff Dubois, regarding purchasing marijuana from Pelletier. Dubois testified that he did not literally get the marijuana from Pelletier, agreeing with defense counsel's characterization that "it would just mysteriously appear" in his car. According to the court, this "phraseology invite[d] the jury to allow an argument, if it is going to be made, that Mr. Pelletier essentially had nothing to do with the fact that marijuana went into [Dubois's] car." In light of the apparent defense strategy of showing that Pelletier was only involved with cash, and not marijuana, the court concluded that the testimony was probative as rebuttal to an assertion of ignorance or mistake. Moreover, the court noted that any potential prejudice could be countered with a limiting instruction.

Defense counsel reiterated the argument made in the motion in limine that, under Federal Rule of Evidence 403, the probative value of the convictions was far outweighed by the unfair prejudice to Pelletier. The government then suggested another basis for admissibility. Noting that cross-examination of Kendra Cyr had elicited testimony about Pelletier's potentially legitimate sources of income, the prosecutor posited that the prior convictions were probative of Pelletier's intent and knowledge. The court agreed, denied the motion in limine, and, at defense

counsel's request, immediately gave a limiting instruction to the jury. The court first instructed the jury that the evidence could not be used to show that Pelletier is a bad person or that he committed the crimes for which he was standing trial, but "only to show possible motive, his intent, his preparation, any plan, or absence of mistake or accident." Both sides declined any further instruction. As Pelletier's counsel requested, the court's final jury instructions on the prior crime evidence did not include the purposes for which the evidence could be used.

On the final day of trial, Pelletier called his sister-in-law (and former girlfriend) Rina Pelletier to testify about his legitimate sources of income, including watchmaking and jewelry making. She also testified about her own employment, their joint purchase of a home, and profits Pelletier made from selling certain property. On cross-examination, the government asked several questions concerning Michael Pelletier's drug trafficking activities and arrest in 2000, prior to the charged conspiracy. The defense did not object to the cross-examination.

Pelletier argues that admission of Hafford's statement that Pelletier was in jail "for drug charges" and the questioning of Rina Pelletier about Michael Pelletier's criminal past violated Federal Rules of Evidence 403 and 404(b). Given the defense's trial objection, we review the trial court's admission of Hafford's statement for abuse of discretion. United States v. Hicks, 575 F.3d 130, 141 (1st Cir.), cert. denied, 130 S. Ct. 647 (2009). The lack of objection to the government's questioning of Rina Pelletier

subjects that testimony to plain error review. United States v. Rodríguez-Berríos, 573 F.3d 55, 63 (1st Cir. 2009), cert. denied, 130 S. Ct. 1300 (2010). There was no error in the admission of any of the testimony, plain or otherwise.

Rule 404(b) prohibits the admission of evidence of a person's "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). While the rule allows such evidence as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," id., the "other acts" may not be used for the sole purpose of proving that a defendant had a propensity to commit a crime, see Rodríguez-Berríos, 573 F.3d at 64.

We employ a two-part test to determine whether the district court abused its discretion under Rule 404(b). First, we evaluate whether the evidence has "special relevance," that is, whether it is relevant to any purpose other than to prove that a defendant has a propensity to commit a crime. Id. Then, special relevance notwithstanding, we must determine whether the probative value of the evidence is substantially outweighed by its danger of unfair prejudice. Id.; Fed. R. Evid. 403.

Pelletier first argues, without citation to case law, that the court committed reversible error simply because it admitted the testimony without the prosecution asking for it to reconsider its original position. We can find no support for this

reasoning, and proceed to evaluate the district court's decision under our two-part test.[6]

First, we agree with the district court that the cross-examination of government witnesses opened the door to introduction of Pelletier's prior convictions. Where defense counsel's questioning raised the specter of Pelletier having legitimate sources of income, and of not taking part in the delivery of marijuana which "mysteriously appeared" in a buyer's car, there was no abuse of discretion in allowing the evidence in response. E.g., United States v. Balthazard, 360 F.3d 309, 317 (1st Cir. 2004) (finding no error in allowing evidence in response to issue raised by defense counsel). To the contrary, failure to allow such evidence "could allow 'litigants to create misleading impressions, secure in the knowledge that the other side was barred from disabusing the jury.'" United States v. Marin, 523 F.3d 24, 29 (1st Cir. 2008) (quoting United States v. Catano, 65 F.3d 219, 226 (1st Cir. 1995)).

Pelletier next claims that the evidence of his prior drug crimes had no special relevance. We disagree. In the context of drug conspiracy cases, we have found prior convictions probative of knowledge and intent where they indicate a prior relationship between conspirators, United States v. Landrau-Lopez, 444 F.3d 19, 24 (1st Cir. 2006), and where they may be relevant to the

_____

[6]While the prosecutor immediately disclaimed Hafford's comment, he indicated during a pretrial conference that the defendant's prior involvement in drug trafficking might become an issue if Pelletier disputed knowledge or intent at trial.

-8-

defendant's knowledge of the presence of contraband and intent to distribute it, United States v. Nickens, 955 F.2d 112, 124-25 (1st Cir. 1992). Here, given Pelletier's apparent defense, these issues were squarely -- even if only implicitly -- placed before the jury.

Pelletier argues that none of the permissible 404(b) factors were genuine issues in the case. Instead, he claims that the defense strategy was to undermine government witness credibility, rather than to contest any particular aspect of the case. Based on our review of the transcript of the proceedings, this claim rings hollow. "[T]he simple fact that [the defendant] did not argue lack of knowledge or intent . . . would not, by itself, remove those issues from the case." United States v. Ferrer-Cruz, 899 F.2d 135, 138 (1st Cir. 1990). Where, as here, the defendant did not stipulate to the court that he would not dispute those issues such that the trial court would have been justified in preventing the very cross-examination conducted below, the court was well within its discretion in admitting the evidence under Rule 404(b). See id. at 139.

We also have little difficulty concluding that the probative value of the evidence exceeded any unfair prejudice to Pelletier. As we noted in the 404(b) analysis, the evidence was probative of Pelletier's knowledge and intent, and served to rebut inferences raised in cross-examination. Moreover, the court's limiting instruction cabined any potential prejudice. See United States v. Ofray-Campos, 534 F.3d 1, 35 (1st Cir. 2008). Finally, to the extent that Pelletier now claims that the limiting

instruction was defective because it did not pare down the list of permissible uses of the evidence, we note that trial counsel was apprised of the proposed language, declined an opportunity to provide the court with any changes, and again declined comment after the instruction was read to the jury.  We thus deem his challenge to the limiting instruction waived.[7]  See United States v. Medina, 427 F.3d 88, 91-92 (1st Cir. 2005) (finding waiver in response to "a party's considered decision not to avail itself of a procedural right").[8]

Based on the foregoing, we conclude that the testimony regarding Pelletier's prior crimes was properly admitted.

B.  Michael Easler's statements against interest

Hafford testified that Pelletier had recruited him to help smuggle marijuana, asking Hafford to call when Hafford got out of prison.  Hafford did, in fact, connect with Pelletier upon his release in 2004.  He testified that at a June 2004 meeting, Pelletier offered him two jobs: swimming marijuana across the river

_____

[7]In his reply brief, Pelletier refutes the government's waiver argument by arguing that defense counsel "did in fact ask that a limiting instruction not list the purposes for which the evidence of prior crimes could be used."  The transcript citation, however, is for a colloquy which occurred prior to the court's delivery of the final jury instructions.  The fact remains that counsel remained silent at the time of the curative instruction at issue.

[8]We note that even if the district court did commit error, any such error was harmless.  As trial counsel noted during the final charging conference, references to Pelletier's criminal past were "brief" and "in passing."  Moreover, the prosecutor did not mention the prior conviction in his closing argument. See United States v. Benitez-Avila 570 F.3d 364, 372 (1st Cir.) (finding improper admission of testimony harmless where it was highly probable that the error did not influence the verdict), cert. denied, 130 S. Ct. 429 (2009).

for Pelletier, and finding a man named Michael Easler, who -- Pelletier claimed -- had robbed him of $310,000. Coincidentally, Hafford had met Easler during his earlier prison stint, and although the two did not discuss Pelletier, Hafford testified that before he left prison he learned that Easler had worked for Pelletier.

That brings us to the second evidentiary challenge, to Hafford's testimony about a conversation that he had with Easler while both were in a Maine county jail in 2007. Over defense counsel's hearsay objection, which was considered at a sidebar conference, Hafford testified that Easler told him that he was in jail for drug trafficking; that he had been smuggling marijuana for Pelletier by swimming across the St. John River with sixty pounds of marijuana beginning in "springtime" and ending when "there was ice in the water"; and that he had stolen $110,000 from Pelletier.

Hafford's testimony about Easler's comments was undoubtedly hearsay, as it was offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c) and 802. The trial court, however, accepted the government's argument that it was admissible as an exception to the hearsay prohibition pertaining to statements against interest:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, . . . that a reasonable person in the declarant's position would not have made the statement unless believing it was true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless

-11-

> corroborating circumstances clearly indicate
> the trustworthiness of the statement.[9]

Fed. R. Evid. 804(b)(3).

Pelletier claims on appeal that Easler's statements did not satisfy Rule 804(b)(3). He also claims that the admission of Easler's statements violated his rights under the Sixth Amendment's Confrontation Clause. This latter argument was not raised below, and is therefore reviewed only for plain error. There was no error under either theory.

### 1. Rule 804(b)(3)

Pelletier first argues that Easler's statements to Hafford do not satisfy 804(b)(3) because they are not against his penal interest, or at least not sufficiently so to warrant their admission. The construction of the evidentiary rule presents a question of law and is subject to de novo review. United States v. Barone, 114 F.3d 1284, 1296 (1st Cir. 1997). The application of the rule to particular facts is reviewed for abuse of discretion. Id. A statement is admissible as against the declarant's penal interest if it "tend[s] to subject the declarant to criminal liability to such an extent that a reasonable person would not make the statement unless it were true." United States v. Jiménez, 419 F.3d 34, 43 (1st Cir. 2005). "[T]his question can only be answered in light of all the surrounding circumstances." Barone, 114 F.3d

---

[9]The rule also requires that the declarant be unavailable to testify. Fed. R. Evid. 804(b). The parties so stipulated, as Easler's counsel had indicated that Easler would invoke his Fifth Amendment rights against self-incrimination, thus making him "unavailable" within the meaning of the rule. See Fed. R. Evid. 804(a)(1).

at 1295 (quoting Williamson v. United States, 512 U.S. 594, 599 (1994)).

In support of his argument, Pelletier notes that Easler's statements to his fellow inmate were mere "boasts," and were indistinguishable from the "braggadocio" and "boasting" that we have previously found lacking in reliability. See, e.g., United States v. Connolly, 504 F.3d 206, 215 (1st Cir. 2007). This reliance on Connolly is misplaced. Connolly, and cases it relies on, involved recantations, which we have described as "generally viewed with considerable skepticism." Id. at 214 (quoting United States v. Carbone, 880 F.2d 1500, 1502 (1st Cir. 1989)). Easler's comments were the opposite of a recantation. Indeed, Easler implicated himself in the very conspiracy for which Pelletier was convicted.

Pelletier also suggests that by the time Easler made those statements, he had already been indicted on charges related to this case and thus could not have believed his statements to Hafford would further subject him to criminal liability. This argument is meritless: the statements "inculpate[d] him in criminal acts and conspiracies with others to commit criminal acts." Barone, 114 F.3d at 1297. They also demonstrated "an insider's knowledge of a criminal enterprise and its criminal activities," which is another indication that the statements were against his penal interest. Id. Against this backdrop, we conclude that Easler's statements were sufficiently adverse to his penal interests to fall within Rule 804(b)(3).

-13-

Our inquiry does not end there, however, as the rule also requires "corroborating circumstances [that] clearly indicate the trustworthiness of the statement."[10]  It is not necessary that the corroboration consist of "independent evidence supporting the truth of the matter asserted by the hearsay statements, but evidence that clearly indicates that the statements were worthy of belief, based upon the circumstances in which the statements were made." Barone, 114 F.3d at 1300.

The thrust of Pelletier's argument is that Easler had a strong motive to lie because he had stolen a considerable amount of money from Pelletier and would therefore benefit from Pelletier's lengthy incarceration.  However, the fact that Easler made the statements to fellow inmate Hafford, rather than in an attempt to curry favor with police, cuts in favor of admissibility. See id. at 1301 (finding fact that declarant made statements to relatives rather than police a corroborating circumstance).  Pelletier also claims that Easler's attempt to minimize his own role as little more than that of a swimming drug mule, while at the same time puffing up Pelletier's role as ringleader, suggests untrustworthiness.  Although this may be a plausible view of Easler's statements, it is not the only one. The record reflects that Easler's description of his involvement tracked Hafford's

_____

[10]By its terms, the rule in effect during Pelletier's trial required corroboration only for statements offered to exculpate the accused. See Fed. R. Civ. P. 804(b)(3) (1975) (repealed 2010).  We have required corroboration for inculpatory statements as well, Barone, 114 F.3d at 1300 n.10, and the current rule includes the inculpatory corroboration requirement.  Fed. R. Evid. 804(b)(3) (effective Dec. 1, 2010).

-14-

description of his own aquatic smuggling. This suggests that Easler was not, in fact, minimizing his role in the conspiracy.

"[T]he 804(b)(3) corroboration inquiry is concerned only with the admissibility of hearsay evidence based upon its trustworthiness, a determination committed to the sound discretion of the district court." Id. Even where the call is close, and we do not find to it be especially close here, we respect the district court's determination, absent clear abuse. Barone, 114 F.3d at 1296. We conclude that the district court did not abuse its discretion in admitting Easler's statements under Federal Rule of Evidence 804(b)(3).

### 2. Confrontation Clause

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In Davis v. Washington, 547 U.S. 813 (2006), the Court held that the Confrontation Clause applies only to "testimonial" hearsay. Id. at 821. Thus, "[t]he threshold question in every case is whether the challenged statement is testimonial. If it is not, the Confrontation Clause 'has no application.'" United States v. Figueroa-Cartegena, 612 F.3d 69, 85 (1st Cir. 2010) (quoting Whorton v. Bockting, 549 U.S. 406, 420 (2007)).

The testimony about Easler's statements during inmate-to-inmate conversation was subject to cross-examination in court. The evidence was not contained in ex parte in-court testimony or an affidavit. The "primary purpose" of the statements was not the

-15-

establishing or proving of some fact at trial.  Bullcoming v. New Mexico, 564 U.S. ___, ____ (2011) (slip op., at 9); id. (Sotomayor, J., concurring, at 1); Michigan v. Bryant, 562 U.S. __, __ (2011) (slip op., at 11).

Although we have not previously had occasion to apply Davis to the situation presented here -- statements made by one inmate to another -- we have little difficulty holding that such statements are not testimonial.  Our position is consistent with that of both the Supreme Court, see Davis, 547 U.S. at 823 n.2 (noting, in dicta, that statements from one prisoner to another are "clearly nontestimonial") (citing Dutton v. Evans, 400 U.S. 74, 87-89 (1970) (plurality opinion)), and other circuit courts that have held inmate conversations to be nontestimonial, see United States v. Smith, 383 F. App'x 355, 357 (4th Cir. 2010) (unpublished); United States v. Spotted Elk, 548 F.3d 641, 662 (2nd Cir. 2008); United States v. Johnson, 495 F.3d 951, 976 (8th Cir. 2007); United States v. Johnson, 192 App'x 935, 938 (11th Cir. 2006) (unpublished); see also United States v. Smalls, 605 F.3d 765, 778 (10th Cir. 2010) (finding statement made to confidential informant nontestimonial where declarant knew informant only as an inmate); United States v. Johnson, 581 F.3d 320, 323-24 (6th Cir. 2009) (same).

Moreover, Easler's jailhouse statements to Hafford bear none of the characteristics of testimonial hearsay.  They were made not under formal circumstances, but rather to a fellow inmate with a shared history, under circumstances that did not portend their

-16-

use at trial against Pelletier.  See Davis, 547 U.S. at 824 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."  (quoting Crawford, 541 U.S. at 51)); see also United States v. Brito, 427 F.3d 53, 60 (1st Cir. 2004) (describing testimonial statements as those that a declarant would reasonably understand will be preserved for prosecutorial use); Horton v. Allen, 370 F.3d 75, 84 (1st Cir. 2004) (finding statements non-testimonial where they were part of a private conversation with a non-police officer).  Accordingly, we conclude that the Confrontation Clause was not implicated by the admission of Hafford's testimony.[11]

### III.  Jury Instructions

Pelletier was convicted of, inter alia, conspiracy to import marijuana and conspiracy to possess with intent to distribute marijuana.  See 21 U.S.C. §§ 841(b)(1)(A)(vii), 846, 960(b)(1)(G), 963.  At the close of evidence, the trial judge first instructed the jury on the elements of conspiracy, including the requirement that the government prove that Pelletier intended that the underlying crimes -- importation of marijuana and possession with intent to distribute marijuana -- be committed.

---

[11]In a footnote to his brief, Pelletier acknowledges Davis's holding that non-testimonial evidence does not fall within the Sixth Amendment's proscription, but baldly states that we should avoid a "rubber-stamp" application of Davis because "the attributes of Easler's jailhouse statements make them unique."  Pelletier does not, however, elaborate any further.  Finding nothing unique about Easler's statements to Hafford, we see no reason to depart from the path cut by Davis.

The court's instruction on the underlying importation crime included the following language: "It is against federal law to import marijuana into the United States. To import means to bring or transport into the United States from someplace outside the United States." With respect to distribution, the charge stated: "It is against federal law to have marijuana in your possession with the intention of distributing it to someone else, and it is against -- it is against federal law to distribute marijuana."

Pelletier argues that the instruction on importation was missing two elements related to scienter: that the importation was knowing and intentional; and that Pelletier knew the marijuana came from outside the United States. See United States v. Geronimo, 330 F.3d 67, 72 (1st Cir. 2002) ("[T]o convict a principal actor of importing a controlled substance, the prosecution must prove that the accused knew the drugs were imported.") He cites a similar putative defect in the distribution instruction: that the instruction lacked the elements of specific intent to distribute, as well as knowing and intentional possession. United States v. Dyer, 589 F.3d 520, 534 (1st Cir. 2009) ("[W]e have consistently held that to prove possession with intent to distribute in violation of 21 U.S.C. § 841, the government must establish that the defendant knowingly and intentionally possessed a controlled substance with specific intent to distribute."), cert. denied, 130 S. Ct. 2422 (2010).

As no objection was lodged at trial, we review for plain error.  United States v. Garcia-Pastrana, 584 F.3d 351, 382 (1st Cir. 2009) (noting that plain error standard requires a defendant to "show an error that was plain (i.e., obvious and clear under current law), prejudicial (i.e., affected the outcome of the district court proceedings), and that seriously impaired the fairness, integrity, or public reputation of the judicial proceedings" (quoting United States v. Griffin, 524 F.3d 71, 76 (1st Cir. 2008))), cert. denied, 130 S. Ct. 1724 (2010).  An unpreserved objection to a jury instruction will only rarely justify reversal of a conviction.  Id.  (citing United States v. Weston, 960 F.2d 212, 216 (1st Cir. 1992)).

The government claims that there was no error, citing to the court's preliminary instructions -- given prior to the parties' opening statements -- which included the following language:

> The underlying crime of importing a drug requires intentional and knowing importation of that drug and knowledge that the drug came from outside the United States.
> The underlying crime of possessing a drug with the intent to distribute it requires intentional possession of the drug with the specific intent to transfer it to someone else.

Even if we assume, however, that the preliminary instructions did not cure subsequent flaws in the final instructions, Pelletier is not necessarily entitled to relief.  A trial court's failure to instruct the jury on all statutory elements is not a structural error, and thus Pelletier must show prejudice to warrant reversal of his conviction.  Neder v. United

-19-

States, 527 U.S. 1, 9 (1999); United States v. Hebshie, 549 F.3d 30, 44 (1st Cir. 2008).  To meet this burden, Pelletier must show a "reasonable probability that, but for [the error claimed], the result of the proceeding would have been different."  Hebshie, 549 F.3d at 44; United States v. Moran, 393 F.3d 1, 13 (1st Cir. 2004) (noting that, in context of jury instructions, plain error requires showing that allegedly erroneous instruction affected outcome of trial).  We can affirm the conviction if "the result would quite likely have been the same despite an erroneous instruction."  Hebshie, 549 F.3d at 44 (quoting United States v. O'Brien, 435 F.3d 36, 40 (1st Cir. 2006)) (internal quotation marks omitted).

While the final instruction easily and quickly could have been corrected if either the defense or prosecution had brought the issue to the court's attention, we nevertheless conclude that the result at trial was quite likely unaffected.  With respect to the importation charge, Pelletier's ex-girlfriend Cyr testified about meeting Pelletier's Canadian drug source at least five times.  She also related Pelletier's tale of hiding money in his wheelchair seat during a trip to Canada.  Hafford, in addition to his testimony about his conversations with Easler, testified that Pelletier told him how the scheme worked.  The evidence was thus overwhelming that Pelletier knew the marijuana he was selling came from outside the United States. Additionally, Cyr's testimony that Pelletier informed her that Easler was bringing marijuana from Canada, distributing it for him, and bringing him drug sale proceeds -- which Cyr testified she counted and stacked with

Pelletier -- proved beyond doubt Pelletier's knowledge and intent. Accordingly, the instruction on the count charging conspiracy to import was not plainly erroneous.

We have little difficulty reaching the same conclusion on the distribution count. In addition to the evidence limned above, the jury heard Cyr testify that Pelletier met with customers in Portland, Maine, and the jury also heard Dubois's testimony about paying Pelletier for marijuana to sell after he moved to New Hampshire. Again, the evidence was overwhelming that Pelletier possessed marijuana with the specific intent to distribute it, and that he did so knowingly and intentionally.

In sum, Pelletier has failed to demonstrate that the instructions at issue affected the outcome of the trial. We therefore conclude that the allegedly improper instructions did not amount to plain error.

### IV. Drug quantity

Pelletier's post-trial motion for acquittal focused solely on the issue of whether there was sufficient evidence to support the jury's verdict that the amount of marijuana attributable to him equaled or exceeded 1,000 kilograms. See 21 U.S.C. § 841(b)(1)(A)(vii); Fed. R. Crim. P. 29. We review de novo the district court's denial of Pelletier's Rule 29 motion. United States v. Rodriguez-Lozada, 558 F.3d 29, 39 (1st Cir.), cert. denied, 130 S. Ct. 283 (2009). We examine the evidence in the light most favorable to the jury verdict, id., and we must be satisfied that "the guilty verdict finds support in a plausible

-21-

rendition of the record," United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006).

The district court based its denial of Pelletier's motion primarily, but not exclusively, on Adam Hafford's testimony regarding both his and Michael Easler's smuggling efforts. Hafford testified that he carried at least sixty pounds of marijuana on each international swim, which took place "every week or two weeks" from June to November 2004. All told, Hafford estimated that he ferried between 1,000 and 1,500 pounds of marijuana while in Pelletier's employ. From this testimony, the district court concluded that the jury was entitled (although not required) to take the higher number, 1,500 pounds, which translates to 680.38 kilograms.

Next, the district court considered Michael Easler's contribution to the operation, as related by Hafford's testimony. As previously discussed, Hafford testified that Easler told him that he carried sixty pounds of marijuana across the river from springtime until "there was ice in the water." The district court found that the jury could reasonably conclude that Easler had smuggled the same amount of marijuana as did Hafford -- 680.38 kilograms -- bringing the total to 1,360.76 kilograms. To this total the district court added the amount of marijuana represented by Easler's theft of drug proceeds from Pelletier. Concluding that the evidence supported a finding that Easler stole between $250,000 and $310,000, and noting that Pelletier bought the marijuana for $1,000 per pound, the court found that the cash represented between

-22-

250 and 300 pounds, or 113.39 to 140.61 kilograms. Thus, the district court concluded that the evidence supported a jury finding well in excess of 1,000 kilograms.

Pelletier's appellate argument boils down to two contentions. The first is that Easler's hearsay statements should not have been placed before the jury, an argument we have already rejected. Beyond the evidentiary argument, Pelletier also asserts that Hafford's estimate of his own involvement and Easler's "springtime to ice in the water" time frame were too imprecise to form the basis for a jury verdict. We disagree. Reduced to its essence, Pelletier's argument is that the jury should have rejected the numbers provided by Hafford and Easler (through Hafford), or that could have been inferred from their statements. Our review, however, "requires that we assume that the jury accepted the government's evidence and drew inferences in its favor." United States v. Santiago, 560 F.3d 62, 65 (1st Cir.) (emphasis added), cert. denied, 130 S. Ct. 140 (2009). Sufficient evidence existed for a reasonable jury to have found beyond a reasonable doubt that Pelletier conspired to import and possess with the intent to distribute 1,000 kilograms or more of marijuana.

**Affirmed**.