In re INCOMNET, INC., a California Corporation; Incomnet Communications Corporation f/k/a National Telephone & Communications, Inc., a Delaware Corporation, Debtors.

Post–Confirmation Committee of Unsecured Creditors of Incomnet Communications Corporation, Appellant,

v.

Universal Service Administrative Company, a Delaware Corporation, Appellee.

BAP No. CC–03–1064–LKMo.
Bankruptcy Nos. SA 99–18854–JR, SA–99–18857–JR.
Adversary No. SA 01–1522–JR.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted on July 23, 2003.

Filed Sept. 12, 2003.

Michael R. Adele, Albert, Weiland & Golden, LLP, Costa Mesa, CA, for Post–Confirmation Committee of Unsecured Creditors.

Jonathan T. Cain, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Reston, VA, for Universal Service Administrative Company.

Before LEE,[1] KLEIN and MONTALI, Bankruptcy Judges.

## *OPINION*

LEE, Bankruptcy Judge.

The Post–Confirmation Committee of Unsecured Creditors of Incomnet Communications Corporation (the "Committee") appeals the bankruptcy court's grant of summary judgment in favor of the Universal Service Administrative Company ("USAC") in this avoidable preference action. The bankruptcy court reasoned that USAC was not a "transferee" from which an avoidable preferential transfer could be recovered. We REVERSE and REMAND.

### FACTS

Under the Telecommunications Act of 1996 (47 U.S.C. § 254 *et seq.*, the "Act"), Congress established a program to support the development of affordable, nationwide telecommunication services, commonly referred to as "universal service." To fund this program, the Act requires that all providers of interstate telecommunications and telecommunication services contribute a percentage of their interstate and international revenues (the "Funds") to support universal service.[2] The Federal

---

1. Hon. W. Richard Lee, Bankruptcy Judge for the Eastern District of California, sitting by designation.

2. Each telecommunications provider is assessed a quarterly universal service contribution based on the provider's revenue. 47 C.F.R. § 54.709(a).

Communication Commission (the "FCC") is charged with the statutory responsibility for oversight of the universal service program. The FCC, in turn, has delegated to USAC, a Delaware nonprofit corporation, responsibility for the collection, management, investment and disbursement of the Funds. *See* 47 C.F.R. § 54 *et seq.* USAC ultimately disburses these Funds to schools, libraries, health care providers, low-income consumers, and subscribers in high cost areas to subsidize the cost of telecommunication services.

Incomnet Communications Corporation ("Incomnet"), a telecommunications service provider, filed for chapter 11 relief on September 2, 1999. USAC timely filed a proof of claim in the amount of $545,142.11 based on Incomnet's unpaid universal service contributions. Incomnet did make approximately $470,000 of universal service contributions to USAC within ninety days of its bankruptcy filing (the "Transfer"). In May 2002, the bankruptcy court confirmed Incomnet's Third Amended Plan of Reorganization (the "Plan"). Pursuant to the Plan and the order confirming the Plan,

the Committee is the successor to the Official Committee of Unsecured Creditors and has the powers of a trustee to represent the interests of Incomnet's estate. The Committee then filed this adversary proceeding seeking to avoid the Transfer as a preference. 11 U.S.C. § 547(b).

On June 5, 2002, USAC moved for summary judgment on the grounds that USAC, by virtue of the FCC regulation, could not qualify as a "transferee" under § 550(a).[3] USAC argued that it is so heavily regulated by the FCC that it cannot put the Funds it collects to its own purpose with "unfettered discretion."[4] USAC relied on a line of cases which hold that a "conduit" lacks the requisite degree of dominion or control over the subject property to qualify as a "transferee."

At oral argument of the summary judgment motion, USAC acknowledged that it holds legal title to the Funds and deposits them in its own bank accounts.[5] The bankruptcy court questioned which entity, other than USAC, did have sufficient dominion or control over the Transfer to

---

**3.** Unless otherwise indicated, all "chapter" and "section" references are to the United States Bankruptcy Code, 11 U.S.C. §§ 101–1330.

**4.** The activities of USAC, the amount of the contributions collected by USAC, and the actual disbursement of the Funds are regulated by the FCC. *See* 47 C.F.R. § 54 *et seq.* The amount of the universal service support contributions is calculated by the FCC under a prescribed formula for each service provider. 47 C.F.R. § 54.709(a)(2). Each quarter, the FCC adjusts the percentage that a carrier must contribute to ensure sufficient funding. 47 C.F.R. § 54.709(a)(3). These Funds are ultimately disbursed to pay USAC's operating expenses and to various agencies to support telecommunication services described, supra. Before it may make any disbursement, USAC must submit its quarterly budget to the FCC for review. 47 C.F.R. §§ 54.709(a)(3), 54.715(c). USAC is prohibited from disburs-

ing any Funds prior to the FCC's approval of USAC's quarterly budget. 47 C.F.R. § 54.715(c).

**5.** In both parties' pleadings and the bankruptcy court's opinion, there is repeated reference to a Universal Service Fund (the "Fund"). Based on this concept of a "Fund," there was significant briefing over whether USAC was properly sued in its capacity as a "representative" of the "Fund." This panel was unable to find any legislative authority for the creation of this "Fund" as a separate legal entity. Further, when this panel questioned USAC's counsel on the matter at oral argument, he acknowledged that there is no separate legal entity called the "Universal Service Fund." The bankruptcy court's grant of summary judgment was not based on the conclusion that USAC was not a proper party. However, as we hold that USAC was the transferee of the Funds, it would appear that USAC was sued in the proper capacity.

qualify as the transferee. In other words, who was USAC the "conduit" for? USAC offered no alternative transferee.[6] On December 20, 2002, the bankruptcy court granted summary judgment in favor of USAC based on its conclusion that USAC did not have the requisite degree of "unfettered control" over the Transfer to qualify as a transferee under § 550(a).[7] The Committee timely appealed.

## ISSUES

1) Was USAC the actual recipient of the Transfer?

2) Did the FCC's regulation of USAC effectively exempt USAC from liability under § 550(a)?

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(F). A judgment based on the grant of a motion for summary judgment is a final order and we have jurisdiction

under 28 U.S.C. § 158(a) & (b). The notice of appeal was timely filed, and there have been no intervening occurrences to render this appeal moot.

## STANDARD OF REVIEW

 Summary judgments are reviewed de novo. *Danning v. Miller (In re Bullion Reserve of N. Am.)*, 922 F.2d 544 (9th Cir.1991). Construing the summary judgment evidence in the light most favorable to the nonmoving party, the Panel must determine whether there are genuine issues of material fact and whether the lower court correctly applied the relevant law. *Id.*

## DISCUSSION

As the material facts in this case appear to be without dispute, this analysis will focus on whether the bankruptcy court correctly applied the relevant law.[8]

 The Committee seeks to avoid the Transfer under § 547(b).[9] Pursuant to

---

**6.** USAC did suggest that the FCC might qualify as a transferee due to its control over the "ultimate destiny" of the Funds. However, USAC failed to develop any theory to demonstrate how the FCC might qualify as a creditor within the scope of 11 U.S.C. § 547(b)(1).

At oral argument of the appeal, this panel again raised the issue of which entity, other than USAC, had sufficient dominion or control over the Transfer to qualify as the transferee. This time, USAC's counsel suggested that the schools, libraries, *et al.* that ultimately receive the benefits of the universal service program may be the proper transferees. This panel then inquired as to how the recipients, or the FCC for that matter, might qualify as creditors under 11 U.S.C. § 547(b)(1). USAC's counsel was unable to respond.

**7.** USAC raised the "ordinary course" defense in its answer to the complaint. As the summary judgment ruling terminated the litigation, the trial court never considered the merits of this defense.

**8.** Although both parties acknowledge that USAC is a highly-regulated organization,

there appears to be some dispute as to the level of discretion USAC has in how it uses and distributes the Funds. It is our opinion that as long as USAC was the recipient of the Transfer, the actual level of discretion USAC may have in use of the Funds is immaterial.

**9.** Section 547(b) provides:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 day before the date of the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the petition if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more that such creditor would receive if—

§ 550(a), an avoided transfer may be recovered from, inter alia, a "transferee" of the property.[10] However, neither the Bankruptcy Code nor the legislative history define the term "transferee" for purposes of § 550(a). The bankruptcy court concluded that USAC did not qualify as a "transferee" under § 550(a) because it did not have "unfettered control" over the Funds. In other words, the bankruptcy court reasoned that even if the Transfer were successfully avoided, the Committee could not recover the Transfer from USAC.

In reaching this conclusion, the bankruptcy court relied on a line of cases which develop the Seventh Circuit's "dominion or control" test first established in *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir. 1988), and later adopted by the Ninth Circuit in *Bullion Reserve*. However, we hold that *Bonded Financial, Bullion Reserve*, and the other cases applying the "dominion or control" test are inapplicable here because they are "conduit" cases, while the present case is not.

 The fundamental analysis of whether a person is a "transferee" does not require a determination of dominion or control. Section 550 makes no mention of "dominion or control" as an element of

relief. Rather, the general rule is that "the party who receives a transfer of property directly from the debtor is the initial transferee." *5 Collier on Bankruptcy* [15th Ed. Revised], ¶ 550.02[4][a], pg. 550–18 (acknowledging that the "conduit" rule is an equitable exception to this general rule). The Seventh Circuit established the "dominion or control" test as an equitable exception to the general rule in an effort to protect entities, such as banks, that act as "financial intermediaries." *Bonded Financial*, 838 F.2d 890. In other words, the Seventh Circuit held that a "conduit," one who merely passed an asset to the transferee pursuant to a legal or contractual duty, should not be held liable for the return of an avoidable transfer. *Id.*

In *Bonded Financial*, the chapter 7 trustee of the debtor corporation brought an adversary proceeding against a bank to recover a fraudulent conveyance. The transfer involved a check from the debtor payable to the bank's order, but transferred with the express instructions to deposit the check in the debtor's president's personal account. The Seventh Circuit created the "dominion or control" test in the context of trying to distinguish between the transferee and a "conduit"—an entity that merely transfers funds from the debtor to the actual transferee.[11] The

(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

**10.** Section 550(a) provides:

Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.

**11.** In creating this equitable exception for "conduits," the Seventh Circuit recognized the following policy concern:

The check-clearing system processes more than 100 million instruments every day; most pass through several banks as part of the collection process; each bank may be an owner of the instrument or agent for purposes of collecting at any given moment. Some of these instruments represent funds fraudulently conveyed out of bankrupts, yet

court stated that "the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent may be disregarded." 838 F.2d at 893. In its analysis of the facts, the court stressed that the bank "received nothing from Bonded that it could call its own; the Bank was not Bonded's creditor . . . ." *Id.*

The court emphasized that it was the debtor's president, not the bank, who had control over the transferred funds, observing that "[the president] was free to invest the whole $200,000 in lottery tickets or uranium stocks." *Id.* at 893–894. Based on the bank's inability to use the funds for its own purposes, the Seventh Circuit held that the bank was merely a "conduit" and could not qualify as a "transferee" under § 550(a). However, the court was cognizant that its ruling had a limited application, noting, "[s]o the two-step transaction is indeed different from the one-step transaction we hypothesized at the beginning of this discussion." *Id.* at 894.

The Ninth Circuit adopted the Seventh Circuit's "dominion or control" test in *Bullion Reserve,* another fraudulent transfer case. 922 F.2d 544. In *Bullion Reserve,* the disputed transaction involved a transfer of funds from the debtor corporation, through the debtor's president, then in the form of a collateralized "loan" made to the directors of another company ("CBC"). The transaction was a scheme to sell shares of CBC stock (the collateral) to the debtor's president.[12] There was no dispute that the debtor's president was the "initial transferee" of the funds. The chapter 7 trustee sought to recover the "loan" proceeds from one of the directors of CBC ("Miller") as the "entity for whose benefit such transfer was made." The Ninth Circuit applied the Seventh Circuit's "dominion or control" test and held that Miller was not a transferee. *Id.* at 549. The Ninth Circuit relied on the fact that Miller was under a contractual obligation to pledge the CBC stock immediately to the debtor's president as part of the "loan agreement." As such, the court concluded that Miller did not have dominion or control over the money in that he could not "put the money to [his] own purposes." *Id.* The Ninth Circuit further reasoned that Miller "would not become a transferee unless and until he gained the beneficial interest in the stock . . . ." *Id.*

In reaching its conclusion, the Ninth Circuit paraphrased the Seventh Circuit's "dominion or control" test and stated that "an entity does not have 'dominion over the money' *until* it is, in essence, 'free to invest the whole [amount] in lottery tickets or uranium stocks.'" 922 F.2d at 549 citing *Bonded,* 838 F.2d at 894. (emphasis added). While the Seventh Circuit used the "lottery tickets or uranium stocks" metaphor as a way to contrast the difference between the "conduit" and the "transferee," the Ninth Circuit's inclusion of the term "until" seemingly extends the "lot-

---

the cost of checking back on the earlier transferors would be staggering. . . . Exposing financial intermediaries and couriers to the risk of disgorging a "fraudulent conveyance" in such circumstances would lead them to take precautions, the costs of which would fall on solvent customers without significantly increasing the protection of creditors.

838 F.2d at 893.

12. The CBC stock was not purchased directly by the debtor's president because CBC could not wait for the necessary permits to sell the shares. Accordingly, the directors of CBC acquired the shares and pledged them to the debtor's president as collateral for the "loan." The debtor's president would then acquire the CBC shares by foreclosing against the collateral.

tery tickets or uranium stocks" phrase to define "dominion or control."

This panel later applied the "dominion or control" test in *McCarty v. Richard James Enterprises, Inc. (In re Presidential Corp.)*, 180 B.R. 233 (9th Cir. BAP 1995). In *McCarty,* the debtor corporation had placed funds directly in escrow to fund the purchase of a home for its president. At the close of escrow, the funds were distributed to various parties, including the seller's real estate agent. The trustee sought to recover the real estate agent's commission. We held that the president, not the realtor, "was the initial transferee, based on the fact that the escrow agent received the funds from the debtor as agent for [the president]." *Id.* at 237. We reasoned that the president "had dominion or control even though he contractually limited that dominion or control." *Id.* at 237–238.

Although our prior panel relied on the Ninth Circuit's "lottery tickets or uranium stocks" statement in *Bullion Reserve,* we also noted that "courts should 'step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable.'" *Id.* at 236 (citing *Bullion Reserve,* 922 F.2d at 549 (quoting *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1199 (11th Cir.1988))).

■ The key distinguishing factor in the present case is that the Transfer to USAC did not involve a two-step transaction— USAC was not a "conduit" to the transferee. USAC does not collect the Funds as an agent for a third party, as in all the cases relied upon by USAC and the bankruptcy court. This case does not fit in the model referred to in *Bonded Financial* where A transfers property to B as an agent for C.

In reaching its decision, the bankruptcy court took the established "dominion or control" test beyond the realm of "conduit" cases for which the test was created by applying it, for the first time, in the context of a one-step transaction—a non-conduit case. The bankruptcy court interpreted the holding in *Bullion Reserve* to suggest that the "dominion or control" test should be applied as a general screening test: i.e. to qualify as a "transferee," an entity must have the ability to use the subject assets for *any* purpose it desires. The bankruptcy court interpreted the "lottery tickets or uranium stocks" phrase to mean that any "transferee" under § 550(a) must have "unfettered control" over the assets.

We do not believe that the bankruptcy court's application of the "dominion or control" test is consistent with the Ninth Circuit's purpose in adopting the test. The "dominion or control" test was created to contrast the difference between the transferee and the conduit, and not to create a new class of entities which may be exempt from § 550. We do not believe that the Ninth Circuit intended to create a new equitable exception to § 550, nor do we believe it intended for the "dominion or control" test to be applied in the case of a one-step transaction.

As this is not a "conduit" case, this panel must fall back on the general rule that the party who receives a transfer of property directly from the debtor is the initial transferee. As a practical matter, the Transfer cannot be recovered from the beneficiaries of the universal service program after it has been commingled with the other Funds in USAC's bank account and distributed to the schools, libraries, *et al.* We also note that USAC filed the proof of claim as the entity vested with the power to recover Incomnet's unpaid universal service assessments. It is only logical and equitable that USAC be the party

against whom recovery may be sought pursuant to § 550(a). As the Transfer was made in a one-step transaction, and it is undisputed that USAC acquired title to the Funds as the recipient of the Transfer, this panel holds that USAC was a "transferee" under § 550(a).

### CONCLUSION

USAC was a "transferee" under § 550(a) in that it was the actual recipient of the Transfer. Although there were no apparent issues of material fact, USAC was not entitled to judgment as a matter of law. The bankruptcy court's grant of USAC's summary judgment motion is REVERSED and this matter is REMANDED for further proceedings consistent with this decision.